# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| FIGHT FOR NEVADA,  )<br>  )<br>      Plaintiff,  )<br>  )<br>v.   )<br>  )<br>BARBARA CEGAVSKE, in her official capacity  )<br>as the Secretary of State of Nevada,  )<br>  )<br>  )<br>      Defendant.  ) | Case No.<br><br>**Jury Trial Demanded** |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## INTRODUCTION

1. Plaintiff Fight for Nevada, by and through their counsel, Barnes Law, and pursuant to the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983, state the following complaint for declaratory judgment and permanent, preliminary, and emergency injunctive relief against Barbara Cegavske, in her official capacity as the Secretary of State of Nevada, to prevent her from enforcing the petition deadlines found in NRS 306.015(3) due to the hardship imposed by the ongoing Coronavirus pandemic and Governor Sisolak's related emergency orders.

## PARTIES

1. Plaintiff Fight for Nevada is an official committee for the recall of a public officer registered under NRS 294A.250. Plaintiff seeks to circulate petitions for the recall of Governor Sisolak.

1

2.     Defendant Barbara Cegavske is the Secretary of State of Nevada and is sued in her official capacity. The Secretary of State oversees the State's electoral processes including but not limited to managing the submission process for petitions to recall a public officer.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

4.     Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

5.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendant resides in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## FACTS

### A. The Nevada Recall Process

6.     NRS 306.015 et. seq., establish the procedure for the recall of a public official, while the Constitution of Nevada sets forth the required number of signatures for the recall petition.

7.     NRS 306.015 requires that a group wishing to circulate petitions for the recall of a public official must first file a notice of intent with the Secretary of State. Plaintiff filed its notice of intent on February 14, 2020.

8.     The petition must contain the signatures of not less than 25% of the number of persons who actually voted in the state, county, district, or municipality, which the public officer represents, at the election in which he/she was elected. Nev. Const. Art. 2, Sec. 9).

9.     In 2020, the number of signatures required for a petition to recall Governor Sisolak is approximately 249,500.

10.     NRS 306.015(3) establishes two deadlines for when the recall petition signatures must be turned over to the Secretary of State.

11.     NRS 306.015(3)(a) requires that all signatures collected between the date of the filing of the notice of intent and the 45th day following the date of the filing of the notice of intent be submitted to the Secretary by the 48th day following the filing of the notice of intent. Plaintiff met this deadline on March 30, 2020.

12.     NRS 306.015(3)(b) requires that all signatures collected after the 46th day following the filing of the notice of intent be submitted to the Secretary on the 90th day following the filing of the notice of intent. Thus, Plaintiff's final deadline for submitting signatures to the Secretary is May 14, 2020.

### B. The COVID-19 Pandemic

13.     COVID-19 is an infectious disease affecting the respiratory system, which was first identified in 2019, in Wuhan, China. Since then, it has spread globally and is now present in all 50 states.

14.     The virus is spread primarily through close contact and via respiratory droplets produced when people cough or sneeze, but is not generally airborne.

### C. Governor Sisolak's Response to COVID-19

15.     In response to the virus' increasing presence in Nevada, on March 12, 2020, Governor Sisolak declared a State of Emergency. In his "Declaration of Emergency for COVID-19" he declared that "the State of Nevada is experiencing events that require a coordinated response for the health and safety of the public."

16. Three days later on Sunday March 15, 2020, Governor Sisolak issued the first of seventeen Declarations of Emergency Directives (the "Executive Orders") intended to combat the spread of COVID-19 in Nevada.

17. On March 17, 2020, Governor Sisolak announced his "COVID-19 Risk Mitigation Initiatives." The Governor's announcement declared that all Nevadans should practice social distancing by maintaining 6-feet between persons and that all public gatherings should be cancelled or postponed.

18. On March 20, 2020, Governor Sisolak issued Emergency Directive 003, which mandated the closure of all non-essential businesses in Nevada.

19. On March 24, 2020, Governor Sisolak issued Emergency Directive 007, which formalized the guidelines established in his earlier "Risk Mitigation Initiatives," mandated that there be no indoor or outdoor public gatherings larger than 10 people, and provided for civil and criminal penalties for those who violated the order.

20. . On April 1, 2020, Governor Sisolak issued a revised Emergency Directive 009, which mandated that any specific time limit set by state statute or regulation for the commencement of any legal action would be tolled from the date of the directive until 30 days from the date the state of emergency declared on March 12, 2020 is terminated.

21. On March 31, 2020, Governor Sisolak issued Emergency Directive 010 mandating that all Nevadans stay in their residences except for limited activity necessary for maintaining essential needs and services.

22. As of the filing of this action, Governor Sisolak's State of Emergency in still in place for an indefinite period of time.

**D. The State of Emergency Makes It Impossible for Plaintiff to Obtain the Necessary Signatures before the May 14th Deadline**

23. On April 2, 2020, in response to multiple inquiries from Plaintiff's members, the Secretary's office informed Plaintiff that they would not be extending the May 14 deadline in light of the pandemic.

24. Fight for Nevada is a grassroots campaign to recall Governor Sisolak that is made possible only through the efforts of local volunteers and is funded entirely on donations.

25. The COVID-19 outbreak and the Emergency Orders have made the already arduous path to obtaining the necessary signatures for a recall petition now impossible.

26. Plaintiff has attempted to obtain as many signatures as possible using remote communication tools, but ultimately these efforts require the large in-person demonstrations that have now been prohibited.

27. At best, continued attempts to obtain signatures is overly burdensome, and at worst it is in direct conflict with directives from everyone in the public health community, which only risks making a very serious situation worse and specifically exposes Plaintiff's volunteers to the additional dangers.

28. Plaintiff believes it would have been able to satisfy the signature requirements for a recall of Governor Sisolak but for the unanticipated and unprecedented pandemic of COVID-19.

29. Plaintiff seeks a limited remedy that poses no burden to the State or the Governor: an extension of the May 14 deadline by a number of days equal to the duration of the State of Emergency declared on March 12, 2020.

30. Plaintiff's requested relief in no different from the relief from statutory deadlines for commencing legal actions found in Emergency Directive 009.

31. Absent an injunction, Plaintiff will be unable to obtain the necessary signatures prior to the May 14 deadline. This will violate their constitutional rights to free speech and free association.

### E. U.S. Constitutional Law

32. The First Amendment declares in no uncertain terms that Congress shall make no law abridging the freedom of speech. U.S. Const. amend. I. *See also Citizens United v. FEC*, 558 U.S. 310, 336 (2010). This restriction against governmental power is applied to the states through the Fourteenth Amendment. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).

33. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958).

34. The Supreme Court has made clear, "whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters … state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny" *Id*. at 460-61.

35. The right to "voluntary political association … is an important aspect of the First Amendment freedom" that the Supreme Court "has consistently found entitled to constitutional protection." *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 (1977).

36. A person's ability to exercise their rights guaranteed under the First Amendment is "[u]ndeniably enhanced by group association." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (quoting *NAACP v. Alabama*, 357 U.S. at 460.

37. Ballot restrictions that severely burden the right to vote and associate violate the First Amendment to the U.S. Constitution. See *Storer v. Brown*, 415 U.S. 724, 728-29 (1974).

38. Accordingly, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms. If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973) (internal quotation marks and citations omitted).

39. Therefore, in recognizing that States must enact election codes for orderly, fair, and honest elections, courts reviewing challenges to ballot access cases impose a flexible standard. *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992). If the election regulation imposes a severe burden, then the regulation must survive strict scrutiny. *Id*. at 434. By contrast, if the election regulation imposes a light burden, rational basis or intermediate scrutiny applies. *Id*.

40. Under the current conditions created by COVID-19, including a declared state of emergency in Nevada as well as a declared National emergency, the signature deadline found in NRS 306.015(3) imposes a severe burden on Plaintiff.

41. This burden is compounded because of the various government recommendations that individuals maintain at least six feet distance between them.

42. The Secretary does not have a compelling justification to require Plaintiff to continue circulating large numbers of petitions between now and May 14 when there are guidelines from

7

the U.S. Government, Nevada government, and the Center for Disease Control recommending people to maintain a safe distance of six feet or more.

43. Furthermore, Nevada cannot claim a compelling justification when Nevada, recognizing the danger imposed by the communicable disease COVID-19, has already temporarily stayed similar statutory legal deadlines.

44. In analogous situations, courts have extended voter registration deadlines in light of natural disasters, such as hurricanes. *See Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250 (N.D. Fla. 2016). In that court's analysis of the burden, the court noted that in the final week before voter registration closed, an estimated 100,000 people were expected to register. *Id*. at 1257. But because of Hurricane Matthew, these potential voters were forced to flee the State. *Id*. Thus, these potential voters could not vote because they were unregistered. *Id*. Florida's voter registration statute imposed a severe burden that it could not justify. *Id*.

45. Because the inability to register to vote meant these 100,000 people could not vote, the court ruled that was a severe burden. *Id*.

46. Florida could not justify its severe burden because, similar to here, several other states impacted by Hurricane Matthew either extended their voter registration deadlines or permitted voter registration on Election Day. *Id*. Accordingly, under the flexible approach explained in *Burdick*, the court ruled that under any standard, Florida could not justify its decision not to extend voter registration in light of Hurricane Matthew. *Id*. at 1257-58; *see also Ga. Coalition for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344 (S.D. Ga. 2016) (ordering an extension of voter registration deadline due to Hurricane Matthew because the loss of the right to vote would be an irreparable harm and when balanced to the administrative burden of extending registration deadline, the harm to voting rights outweighed the administrative burden).

47. Accordingly, Nevada does not have a compelling or even sufficiently important interest to justify maintaining the May 14 deadline in light of the current public health emergency.

48. At all times stated herein Defendant was acting under color of state law.

## CLAIMS FOR RELIEF

## COUNT ONE

### (Violation of First and Fourteenth Amendment Rights – 1983 Action)

49. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

50. The First Amendment to the United States Constitution provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

51. The First Amendment's guarantees of freedom of speech, freedom of the press, freedom of assembly, freedom of religion, and freedom to petition for redress of grievances are applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution.

52. Under 42 U.S.C. § 1983, every person who, under color of state law, subjects any citizen of the United States to the deprivation of "rights, privileges, or immunities secured by the Constitution and laws," shall be liable to the injured party.

53. Defendant's actions effectively prohibit Plaintiff from obtaining the required number of signatures, and in turn, will result in the denial and termination of their effort to recall Governor Sisolak in violation of their freedoms of speech and association, equal protection, and due

process rights as guaranteed by the First and Fourteenth Amendments, and as enforced by 42 U.S.C. § 1983.

54.     Under the Declaration of Emergency, it is impracticable for Plaintiff to obtain 250,000 petition signatures.

55.     Under the Declaration of Emergency, Nevada's petition signature requirements are overly broad, in no way narrowly tailored, and deprive Plaintiff of their First and Fourteenth Amendment Rights.

56.     Defendant has no governmental interest so compelling as to justify the denial of Plaintiff's rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

57.     Defendant has less restrictive means by which their interests could be met.

58.     Plaintiff has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their constitutional rights.

59.     Plaintiff is therefore entitled to declaratory and permanent injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks this Court:

A. To immediately issue a temporary restraining order, followed by a preliminary injunction, and ultimately a permanent injunction, restraining Defendant, her officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with her, from enforcing NRS 306.015(3) as it relates to petition signature requirements for recall campaigns of public officials, and order Defendant to grant Plaintiff an extension of the deadline

equal to the number of days Governor Sisolak's State of Emergency and other Emergency Orders restraining public gatherings are in effect.

   B.  To award Plaintiff their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

   C.  To grant such other and further relief as the Court deems just and proper.

DATED:  May 11, 2020                    Respectfully submitted,


_s/ Robert E. Barnes_
Robert E. Barnes, CA SBN #235919
BARNES LAW
*Pro Hac Vice Pending*
601 South Figueroa Street, Suite 4050
Los Angeles, CA 90017
(310) 510-6211 – Main
(310) 510-6225 – Fax
robertbarnes@barneslawllp.com


_s/ Jeffrey Jaeger_
Jeffrey Jaeger, NV SBS #13159
THE LAW OFFICES OF JEFFREY JAEGER
410 South Rampart Boulevard, Suite 390
Las Vegas, NV 89145
(702) 816-3888 – Main
(702) 441-1257 – Fax
jeff@jeffjaeger.com