1  AARON D. FORD
   Attorney General
2  GREGORY L. ZUNINO, Bar No. 4805
   Deputy Solicitor General
3  State of Nevada
   100 N. Carson Street
4  Carson City, Nevada 89701-4717
   Tel: (775) 684-1100
5  E-mail: glzunino@ag.nv.gov

6  *Attorneys for Barbara Cegavske*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| FIGHT FOR NEVADA,<br><br>Plaintiff,<br><br>vs.<br><br>BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State,<br><br>Defendant. | Case No. 3:20-CV-00837-RFB-EJY<br><br>**RESPONSE TO EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** |

Defendant Secretary of State Barbara Cegavske (Secretary), by and through counsel, Aaron D. Ford, Attorney General, and Gregory L. Zunino, Deputy Solicitor General, hereby submits her response to Emergency Motion for Preliminary Injunction. (ECF No. 5).

DATED this 13th day of May, 2020.

          AARON D. FORD
          Attorney General

          By: *Gregory L. Zunino*
               GREGORY L. ZUNINO
               Deputy Solicitor General
               gzunino@ag.nv.gov

          *Attorneys for Secretary of State*

**POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiff Fight for Nevada and its members seek to recall Nevada Governor Steve Sisolak from public office. Fight for Nevada demands a federal court order compelling the Secretary to *violate state law* in order to give its members more time to gather signatures in support of its recall petition. In a nutshell, this case presents the Court with a question of state law, not federal law, because Nevada's recall process is governed by Article 2, § 9 of the Nevada Constitution and Nevada Revised Statutes (NRS) § 306.015 (among other statutes).[1] There is not a single allegation in this case, much less a provable fact, which demonstrates that the Secretary has done anything other than adhere to Nevada law.

To overcome this deficiency in its case, Fight for Nevada argues that the Secretary must actually violate state law in order to facilitate the exercise of rights allegedly granted by the First and Fourteenth Amendments to the U.S. Constitution. But the First and Fourteenth Amendments say little about the *process* for recalling a public official pursuant to state law. As a method of recalling public officials from state office, Nevada statutes and constitutional provisions are admittedly subject to the requirement of the Equal Protection Clause that restrictions on signature gathering be facially neutral and nondiscriminatory. *See Angle v. Miller*, 673 F.3d 1122, 1127 (2012). "[W]hen a state chooses to give its citizens the right to enact laws by initiative [or recall public officials from office], it subjects itself to the requirements of the Equal Protection Clause.") *Id.* (internal citations and quotations omitted).

However, the federal courts have no power to modify provisions of state law when those provisions apply fairly and equally to all petition proponents. "When a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory

---

[1] Like the recall process, Nevada's referendum and initiative processes are governed by comparable provisions imposing deadlines and signature gathering requirements. *See* Nev. Const., Art. 19, §§ 1-2; NRS 295.056(2)-(4).

-2-

interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (*quoting Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)); *see also Arizona Green Party v. Reagan*, 838 F.3d 983, 988 (9th Cir. 2016). This case is unique, moreover, because it involves a challenge to facially neutral, nondiscriminatory provisions of state law governing Nevada's recall process. Because the recall process is akin to impeachment, federal case law addressing the electoral process is only marginally instructive.

The U.S. Supreme Court has made an observation about the popular initiative process that is equally applicable to the state recall process. Regarding the initiative process, the Court observed that "[d]irect lawmaking by the people was 'virtually unknown when the Constitution of 1787 was drafted.'" *Arizona State Legislature v. Arizona Independent Redistricting Commission*, ––– U.S. –––, 135 S. Ct. 2652, 2659 (2015) (*quoting* Donovan & Bowler, An Overview of Direct Democracy in the American States, in Citizens as Legislators 1 (S. Bowler, T. Donovan, & C. Tolbert eds. 1998)). As a means of removing public officials from office, Nevada's recall process, like its popular initiative process, implicates "the structure of its government, and the character of those who exercise government authority." *See id.* at 2673 (*quoting Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S. Ct. 2395, 115 L.Ed.2d 410 (1991)). In summary, it is one method by which Nevada "defines itself as a sovereign." *See id.* In this highly unorthodox lawsuit, Fight for Nevada asks the Court to modify Nevada's sovereign process for recalling public officials from office. Because the recall process involves voting at the end of the process, after a recall proposal has qualified for the ballot, the process is presumed to be governed by the body of federal case law that addresses voting rights under the First and the Fourteenth Amendments to the U.S. Constitution.

However, this case is not about voting. Fight for Nevada challenges only the process for qualifying a recall proposal to appear on the ballot before anyone could cast a vote. As a question of state sovereignty, the process for qualifying a recall proposal is analogous to state laws governing impeachment. *See* Nev. Const., Art. 7, §§ 1–3. So long

as the process is facially neutral and nondiscriminatory, the Secretary's adherence to that process passes muster under rational basis scrutiny, as well as under the *Anderson-Burdick* balancing test as traditionally applied to election cases. *See, e.g., Public Integrity Alliance, Inc. v. City of Tucson*, 863 F.3d 1019, 1027 (9th Cir. 2016) (upholding, under the *Anderson-Burdick* analysis, Tucson's hybrid system for electing members of its city council despite the city's request for application of rational basis scrutiny).

The District of Nevada recently concluded that the Secretary followed the law with respect to the implementation of the all-mail primary election for June 9, 2020. *See Paher v. Cegavske*, ––– F. Supp.3d –––, 2020 WL 2089813 (D. Nev. 2020). And here, it is equally self-evident that the Secretary followed the law as it pertains to the recall process. Adherence to the rule of law serves as a rational basis and lawful justification for the Secretary's decision to deny Fight for Nevada's request for extralegal accommodations as its members attempt to gather signatures in support of their recall proposal.

## II.     BACKGROUND

### A.     Statement of Undisputed Facts

The relevant facts of this case are undisputed. The only dispute in this case concerns: (1) the scope of the Secretary's authority to modify statutory requirements for qualifying a recall proposal to appear on Nevada's ballot (ECF No. 1 at ¶1); and (2) the nature of the State of Nevada's role in creating the conditions that are alleged to have hindered signature gathering efforts in support of Fight for Nevada's recall proposal (ECF No. 1 at ¶¶23-31).

As noted above, Fight for Nevada is a committee seeking to recall Governor Sisolak from public office. (ECF No. 1 at ¶1.1). The Secretary, named as a defendant in her official capacity, is the Chief Officer of Elections for the State of Nevada. NRS § 293.124(1). (ECF No. 1 at ¶2). Her responsibilities include, but are not limited to, execution and enforcement of all provisions of state and federal law relating to elections, including NRS § 306.015. Pursuant to NRS § 293.247(4), the Secretary is further

authorized to "provide interpretations and take other actions necessary for the effective administration of the statutes and regulations governing the conduct of primary, general, special and district elections in this State."

Fight for Nevada requested that the Secretary extend the statutory deadline for gathering signatures in support of its recall proposal. (ECF No. 1 at ¶23). This statutory deadline is set forth at NRS § 306.015(3). Fight for Nevada requests that this statutory deadline be extended for an indefinite period of time (ECF No.1 at pp 10–11). Predictably, Fight for Nevada does not address its members' lack of progress toward gathering the required number of signatures prior to the issuance of the emergency directives of which they complain. (ECF No. 1 at ¶¶16–21). In this regard, NRS § 306.105(3) requires that Fight for Nevada report its signature gathering progress as of the midpoint between the filing of the recall petition and the May 14 deadline for the final submission of signatures. Because the petition was filed on February 14, 2020, the midpoint for signature submission fell on March 30, 2020. (ECF No. 10 at 2:4–6). The total number of unverified signatures submitted at the midpoint was just 15,892, representing a mere 6.5 percent of the total number of signatures required to qualify the recall proposal for the ballot. (ECF. No. 10 at 2:7–11).

B. Overview of Recall and Powers of the Secretary of State

   *i. The Statutory Deadline for Gathering Signatures in Support of a Recall Petition*

The deadline to gather the required number of signatures for a petition for recall is set forth at NRS § 306.015(3). This provision requires that petition proponents submit all necessary signatures for verification not later than the 90th day after the date on which the notice of intent was filed. NRS § 306.015(3) sets forth an additional midpoint deadline for reporting on the progress of signature gathering. As noted above, the midpoint deadline for reporting on the progress of signature gathering was March 30, 2020, and the deadline for the final submission of signatures is May 14, 2020. (ECF No. 10 at 2:1–6). Fight for Nevada had roughly one month, namely the period between

February 14 and March 15, to gather signatures before any COVID-19 emergency directives had taken effect. (ECF No. 10 at 1:22–23). As of March 30, Fight for Nevada had gathered only 6.5% of the signatures required to qualify its recall proposal for the ballot despite the relatively short period of time during which its members had then been subject to social distancing mandates. (ECF No. 10 at 2:7–11).

Although NRS § 293.127565(3) gives the Secretary the authority to extend the statutory deadline when petition gatherers are denied access to public buildings, it is inapplicable to the facts of this case. This provision states that the statutory deadline "must be extended for a period equal to the time that the person was denied the use of a public building for the purpose of gathering signatures on a petition, but *in no event may the deadline be extended for a period of more than 5 days*." NRS § 293.127565(3) (emphasis added). Fight for Nevada does not specifically allege that its members were denied access to a public building, nor does it correlate the requested extension with a specific 5-day time frame as required by NRS § 293.127565(3).

### *ii. Powers of the Secretary of State*

The Secretary had no power to make the statutory modifications requested by Fight for Nevada. Regarding the powers of constitutional officers, including the Secretary of State, the Nevada Supreme Court has stated:

> Every constitutional officer derives his power and authority from the constitution, the same as the legislature does, and the legislature, in the absence of express constitutional authority, is as powerless to add to a constitutional office duties foreign to that office, as it is to take away duties that naturally belong to it. ... It is well settled by the courts that the legislature, in the absence of special authorization in the constitution, is without power to abolish a constitutional office or to change, alter, or modify its constitutional powers and functions

*State ex rel., Harvey v. Second Judicial Dist. Court*, 117 Nev. 754, 765, 32 P.3d 1263, 1270 (*quoting State v. Douglass*, 33 Nev. 82, 92-93, 110 P. 177, 180 (1910)).

The constitutional powers of the Secretary of State are set forth at Article 5, §§ 19 and 20 of the Nevada Constitution. Section 19 sets the qualifications for holding the office of Secretary of State, and establishes a term limit for holding the office, while § 20

gives the Legislature broad latitude to confer powers upon the Secretary of State in regards to record keeping, elections, commercial recordings and various other matters. However, the Legislature has not conferred emergency powers upon the Secretary of State, such that the Secretary would be authorized to make the statutory modifications requested by Fight for Nevada. In this regard, the deadlines for gathering signatures are firmly established in statute. Aside from the provisions of NRS § 293.127565(3), there is nothing express or implied in the Statutes of Nevada that would authorize the Secretary to modify a firm statutory deadline for submitting signatures in support of a recall petition.[2]

Furthermore, any proposal to extend the deadline for gathering signatures for a recall petition is fraught with practical and logistical issues, including the possible necessity of extending initiative petition deadlines as well. These practical and logistical concerns, as well as the ultimate legal question concerning the scope of the Governor's emergency powers, are most appropriately addressed by state and local elected officials as opposed to the federal judiciary. *See, e.g., New York v. U.S.*, 505 U.S. 144, 155 (1992) ("[T]he task of ascertaining the constitutional line between federal and state power has given rise to many of the Court's most difficult and celebrated cases.") For this reason, the Court should afford deference to the requirements of Nevada law.

## III. LEGAL STANDARD

### A. The Standard of Review for Preliminary Injunction

To obtain a preliminary injunction, Fight for Nevada must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This traditional test applies absent Fight for Nevada's ability to demonstrate that the balance

---

[2] While the Governor arguably has emergency power pursuant to Chapter 411 of the Nevada Revised Statute to modify statutory deadlines, there is no mandatory requirement that he do so.

-7-

of equities tips sharply in its favor. *Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1066 n.2 (9th Cir. 2014).

Fight for Nevada cannot meet this burden because it is unlikely to succeed on the merits, having generally non-cognizable claims. Further, Fight for Nevada will not suffer irreparable harm because its proposal to recall the Governor from public office will not likely succeed even if the signature gathering campaign is allowed to continue beyond the statutory deadline for submitting signatures.

Finally, the balance of equities and the public interest during these unusual times weigh heavily against injunctive relief. Extending the deadline for gathering signatures in support of a recall petition will simply prolong the period of time during which signature gatherers will interact with the public, potentially exacerbating the spread of the COVID-19 illness. Additionally, an extension to the recall signature deadline will possibly require, in the interest of fairness, uniformity and consistency, a comparable extension to initiative petition deadlines. These extensions, in turn, would likely have an adverse impact upon preparations for the 2020 general election and the 2021 legislative session. *See* footnote 1, supra.

### B. The Legal Standard for Evaluating Fight for Nevada's Claims

As an initial matter, the Court must determine whether this case presents a question about voting rights or a question about legislative process. If it is the former, the *Anderson-Burdick* balancing test/line of cases provide the applicable analytical framework. Fight for Nevada argues that Nevada law, if enforced according to its plain language, will cause its members irreparable harm. (ECF No. 5 at pp. 7–8). But they cite not a single case from *Anderson-Burdick* which stands for the proposition that federal law gives them a right, in the midst of a pandemic, to demand judicial modifications to Nevada's firmly-established process for qualifying a recall petition to appear on the ballot.

*Angle v. Miller*, supra, is instructive, but not directly on point. As the Court stated in *Angle*, "[t]here is no First Amendment right to place an initiative on the ballot." 673 F.3d at 1133 (*citing Meyer v. Grant*, 486 U.S. 414, 424 (1988)). By this reasoning, there is

likewise no First Amendment right to place a recall proposal on the ballot. The recall process, like the popular initiative process, is a product of state law, not federal law. The general question presented in *Angle* was whether a statutory restriction on signature gathering may, consistent with the First Amendment, disproportionately burden certain categories of speech or specific groups of speakers. *See id.* The Court acknowledged that the Equal Protection Clause applies to the initiative process, *see id.* at 1127–28, but it did not hold that the federal judiciary has the power to order modifications to state initiative laws that are facially neutral and nondiscriminatory. To the contrary, the Court in *Angle* upheld NRS § 295.012, the challenged initiative provision. That provision requires initiative proponents to obtain petition signatures from number of registered voters equal to 10% of votes cast in previous general election in each of state's three congressional districts. *Id.*

The Court upheld the provision precisely because it is facially neutral and nondiscriminatory. As the Court stated, the provision "singles out no discrete or insular minority for special treatment [and] also applies to all initiatives regardless of subject matter, not solely to initiatives thought to be favored by a targeted segment of the population." *Angle*, 673 F.3d at 1132 (*citing Gordon v. Lance*, 403 U.S. 1, 5 (1971) (internal quotations omitted). In this case, the challenged statutory provision governing recall meets those very same criteria.

Nevada case law is likewise instructive, but not directly on point. In *University and Community College System of Nevada v. Nevadans for Sound Government*, the Nevada Supreme Court evaluated the propriety of specific government action that had restricted the use of public facilities for purposes of gathering signatures in support of an initiative petition. 120 Nev. 712, 728, 100 P.3d 179, 191 (2004). There, the Court held that the restrictions in question regarding the time, place, and manner of signature gathering were "permissible restrictions related to legitimate government safety and functional operating purposes." *Id.* Clearly, the social distancing mandates at issue in this case serve the similar purpose of protecting the health and safety of the public.

1 Fight for Nevada does not cite a single case that extends to its members a federal right to require that the Secretary take affirmative action, in violation of Nevada law, to facilitate signature gathering in furtherance of a recall proposal. Furthermore, because this lawsuit challenges a legislative process as opposed to an electoral process, namely a process akin to impeachment, *see Arizona State Legislature*, 135 S. Ct. at 2659, judicial deference is warranted. For example, in *National Association of Social Workers v. Harwood*, the First Circuit Court of Appeals stated that when "a legislative body adopts a rule, not invidiously discriminatory on its face, that bears upon its conduct of frankly legislative business, we think that the doctrine of legislative immunity must protect legislators and legislative aides who do no more than carry out the will of the body by enforcing the rule as a part of their official duties." 69 F.3d 622, 631 (1st Cir. 1995).

As noted above, the statute at issue here is analogous to a rule governing a legislative process, and the role of the Secretary is comparable to that of a legislator who merely enforces those rules. Although there is no judicial precedent for applying legislative immunity in this context, principles of separation of powers and federalism favor rational basis scrutiny over *Anderson-Burdick* scrutiny. *See id.* at 635 ("As a rule, a legislature's regulation of the atmosphere in which it conducts its core legislative activities—debating, voting, passing legislation, and the like—is part and parcel of the legislative process, and, hence, not subject to a judicial veto.")

If the Court applies the *Anderson-Burdick* balancing test, the Court should apply not strict scrutiny, but rather evaluate the "means-ends fit between the state's proffered justification and the rule employed." *See Short v. Brown*, 893 F.3d 671, 676–77 (9th Cir. 2018) In *Crawford v. Marion County Election Board*, for example, the U.S. Supreme Court noted that it has not "identif[ied] any litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters. However slight that burden may appear, as *Harper* [*v. Virginia Bd. Of Elections*, 383 U.S. 663, 86 S. Ct. 1079, 16 L.Ed.2d 169 (1966)] demonstrates, it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the

limitation.'" 553 U.S. 181, 191 (2008) (*quoting Norman v. Reed*, 502 U.S. 279, 288–289 (1992)); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997) ("No bright line separates permissible election-related regulation from unconstitutional infringements."). But, "[w]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (*quoting Anderson*, 460 U.S. at 788); *see Crawford*, 553 U.S. at 189–90 (internal quotation and citations omitted) ("[E]venhanded restrictions that protect the integrity and reliability of the electoral process itself are not invidious.").

As the U.S. Supreme Court did in *Crawford*, this Court should evaluate the constitutionality of applicable Nevada law by focusing on the state's interests. *See id.* at 191. As a matter of principle, the state has an interest in adhering to the rule of law so that deadlines and signature and witness requirements are applied uniformly to all petition proponents.[3] It also has an interest in ensuring: (1) that there is adequate popular support for Fight for Nevada's recall proposal to warrant its inclusion on the ballot; (2) that ballot access is not fraudulently procured over an atypically lengthy period for gathering signatures; and (3) that uniformity and consistency of enforcement and administration are not seriously compromised by making special accommodations for some petition proponents and not others. These are indisputably compelling and longstanding interests.

IV. **ARGUMENT**

**Fight for Nevada is Unlikely to Succeed on the Merits**

A. <u>The Court Lacks Subject Matter Jurisdiction Over the Complaint</u>

As Judge Miranda Du very recently noted, 'the states' police powers over matters of public health and safety and to act over the general welfare of their inhabitants is

---

[3] There are currently two petitions to amend the Nevada Constitution, and four petitions to amends the Statutes of Nevada. The text of those petitions are posted at https://www.nvsos.gov/sos/elections/initiatives-referenda/2020-petitions.

entrenched in the rights reserved to the state under the Tenth Amendment to the United States Constitution." *Paher*, ⸺ F. Supp.3d ⸺, 2020 WL 2089813 at p. 7 (D. Nev. 2020) (*citing Reynolds v. Sims*, 377 U.S. 533, 554 (1964)). And though "the Equal Protection Clause provides a check on such state authority, 'our scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives.'" *Gregory*, 501 U.S. at 462 (*quoting Sugarman v. Dougall*, 413 U.S. 634, 648 (1973)).

The right to recall public officials exists under the Nevada Constitution, not the U.S. Constitution. Accordingly, it is Nevada's constitutional prerogative to place reasonable, nondiscriminatory conditions upon the exercise of that right. Nevada's statutory deadline is a reasonable, nondiscriminatory condition. Admittedly, Nevada now faces a public health emergency that makes it difficult for signature gatherers to satisfy these conditions, but this alleged "burden" on rights granted by the First and Fourteenth Amendments is the same burden that every other Nevadan now faces. Due to the COVID-19 pandemic, Nevadans are not free to interact with their fellow citizens in the same way that they did prior to the pandemic. The limits on mobility and interpersonal contact resulted from the pandemic itself, as well as the health and safety measures that were put in place to limit the spread of the COVID-19 illness. Under the circumstances, the Governor's issuance of these health and safety directives was a proper exercise of the powers reserved to the states under the Tenth Amendment.

In this context, given the absence any discriminatory burdens upon rights existing under the First and Fourteenth Amendments, Fight for Nevada's request for injunctive relief amounts to nothing more than a demand that the Secretary take affirmative action to facilitate the exercise of a right under the Nevada Constitution. In substance, this case presents a question of state law, not federal law, because the state of Nevada has not *impermissibly* burdened any rights under the U.S. Constitution. Therefore, the Court lacks subject matter jurisdiction over Fight for Nevada's claims. Whether the Nevada

Constitution requires that state officials take affirmative steps to accommodate a recall campaign is a question for Nevada's state district courts.

B. <u>Fight for Nevada is Unlikely to Succeed on the Merits of its Claim for a Waiver of the Statutory Deadline for Recall Petitions</u>

Despite having made little progress in gathering signatures prior to March 15, 2020, Fight for Nevada seeks an indefinite extension of the statutory May 14 deadline described at NRS § 306.015(3). As discussed above, however, the deadline is neither discriminatory on its face nor discriminatory in its current application. It impacts all political activists in the same way, regardless of political affiliation, viewpoint, race, ethnicity or gender. Fight for Nevada argues only that the deadline prevents its members from gathering signatures during the COVID-19 pandemic. Fight for Nevada attributes the signature gathering impediment to gubernatorial directives mandating social distancing. However, Fight for Nevada does not identify the source of its members' alleged right under the U.S. Constitution to recall a state public official. Although they have a right under the First Amendment to engage in political advocacy, that right has not been significantly impacted by the enforcement of NRS § 306.015(3). Fight for Nevada and its members remain free to criticize Governor Sisolak in whatever manner they deem appropriate other than through a recall campaign.

In summary, NRS § 306.015(3) serves a legitimate state interest in ensuring that a recall proposal has adequate public support to qualify for the ballot. It also serves the state's interest in making sure that signature gathering is completed within a 90-day period of time, thus minimizing the risk that ballot access may be fraudulently procured over an indefinite period of time. Moreover, the enforcement of NRS § 306.015(3) places no impermissible burden upon a right that is guaranteed by the First or the Fourteenth Amendment to the U.S. Constitution. Although enforcement of the statutory deadline could theoretically impact Fight for Nevada's ability to recall Governor Sisolak, it does not impact its members' ability to criticize Governor Sisolak in some manner other than through a recall campaign. Any burden on their right to engage in political advocacy

through their preferred method of a recall campaign is heavily outweighed by the state's interest in adhering to the rule of law and in maintaining uniformity in the application of Nevada's laws governing the state's initiative, referendum and recall petition processes.

**Fight for Nevada Cannot Demonstrate Irreparable Harm Because There are Adequate Means Available for its Members to Criticize the Governor**

As discussed above, Fight for Nevada does not have a right under the U.S. Constitution to recall a state public official from office. Insofar as Fight for Nevada may prefer to use a recall campaign as a method of criticizing Governor Sisolak, the burden upon this preference is minimal compared to the harm that will likely result to the state if the statutory deadline is extended. Fight for Nevada and its members can continue to criticize the Governor by means other than a recall campaign. Additionally, Fight for Nevada is unable to establish causality between enforcement of the May 14 deadline and its inability to qualify the recall proposal for the ballot. As evidenced by the midpoint submission of signatures, the recall proposal has insufficient public support to earn a place on the ballot. Consequently, due to the lack of a causal relationship between the signature deadline and the inability to gather a sufficient number of signatures, Fight for Nevada cannot reasonably argue that enforcement of the deadline will cause its members irreparable harm. (ECF No. 10 at 2:7–11).

**The Balance of Equities Favors the Secretary**

An extension of the deadline for gathering signatures in support of Fight for Nevada's recall campaign will compromise the state's ability to uniformly and consistently enforce and administer the statutory deadlines and provisions governing the initiative process; it will prolong the time during which signature gatherers will interact with the public, possibly exacerbating the spread of the COVID-19 virus; and it will compromise the state's ability to ensure that the recall proposal has adequate public support to warrant its inclusion on the ballot. Compared with the minimal imposition upon Fight for Nevada's preferred method of criticizing Governor Sisolak, the potential

harm to the state of Nevada weighs heavily in favor of denying the motion for preliminary injunction.

### The Public Interest Favors the Secretary

There is no genuine doubt that Nevada has the power to protect the health of its citizens, particularly in an emergency such as this. Prior to ratification of the Constitution, various colonies had quarantine laws, thereby establishing the legal tradition of local and state jurisdiction over matters of public health reflected in the Constitution's reservation of power to the states to regulate public health, safety, and morals. *Gibbons v. Ogden*, 22 U.S. 1 (1824). It is in this context that Fight for Nevada seeks to exploit the public health emergency for its benefit, invoking the resulting health and safety directives as justification for extending the statutory deadline for gathering signatures in support of a recall campaign. According to the available evidence, the recall campaign has insufficient public support to earn a place on the ballot. Under these circumstances, it is in the public interest to uphold the rule of law and enforce NRS § 306.015(3) according to its plain language.

## V. CONCLUSION

The instant lawsuit against Secretary Cegavske presents a question of state law, not federal law. That question is whether the state has an obligation to facilitate the exercise of a right under the Nevada Constitution when a pandemic makes it difficult to satisfy the lawful statutory conditions on the exercise of that right. Fight for Nevada fails to identify a violation of federal law or the U.S. Constitution. For this reason, and the other reasons discussed above, the Court should deny Fight for Nevada's motion for a preliminary injunction against the enforcement of NRS § 306.015(3)

DATED this 13th day of May, 2020.

        AARON D. FORD
        Attorney General
        By: *Gregory L. Zunino*
             GREGORY L. ZUNINO
             Deputy Solicitor General
             gzunino@ag.nv.gov

*Attorneys for Secretary of State*

## CERTIFICATE OF SERVICE

I certify that I am an employee of the Office of the Attorney General, State of Nevada, and that on this 13th day of May, 2020, I filed and served with this Court's CM/ECF electronic filing system, **RESPONSE TO EMERGENCY MOTION FOR PRELIMINARY INJUNCTION,** served listed below:

Robert E. Barnes, Esq.
robertbarnes@barneslawllp.com

Jeffrey Jaegar, Esq.
jeff@jeffjaeger.com.
*Pro Hac Vice Pending*

*Counsel for Plaintiff*

_____
An employee of the Office
of the Attorney General